NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190732-U

NOS. 4-19-0732, 4-19-0733 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 18, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.W., a Minor, | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Vermilion County |
|       Petitioner-Appellee, | ) | No. 16JA86 |
|         v.   (No. 4-19-0732) | ) | |
| Deanna S., | ) | |
|       Respondent-Appellant). | ) | |
| ------------------------------------------------------------------- | ) | |
| *In re* J.W., a Minor, | ) | No. 16JA86 |
| | ) | |
| (The People of the State of Illinois, | ) | |
|       Petitioner-Appellee, | ) | |
|         v.   (No. 4-19-0733) | ) | Honorable |
| Kenny S., | ) | Thomas M. O'Shaughnessy, |
|       Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Presiding Justice Steigmann and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed, concluding the trial court's fitness and best-interest findings were not against the manifest weight of the evidence.

¶ 2     In August 2018, the State filed a petition to terminate the parental rights of respondent mother, Deanna S., and respondent father, Kenny S., as to their minor child, J.W. (born August 26, 2016). Following a fitness hearing, the trial court found respondents unfit. In October 2019, the court found it was in J.W.'s best interest to terminate respondents' parental rights.

¶ 3        Respondents appeal, asserting (1) the State failed to prove unfitness by clear and convincing evidence and (2) the trial court's best-interest findings were against the manifest weight of the evidence.  For the following reasons, we affirm the judgment of the trial court.

¶ 4                                I. BACKGROUND

¶ 5                                A. Initial Proceedings

¶ 6        In October 2016, the State filed a petition for adjudication of wardship, alleging J.W. was neglected, pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1) (West 2014)), in that (1) the newborn infant's system contained an amount of a controlled substance and (2) her environment was injurious to her welfare because respondent mother's substance abuse made her unsuitable to adequately care for the minor's significant medical issues.  In February 2017, respondent mother admitted the allegations in the petition and the trial court entered an adjudicatory order finding J.W. neglected.  In March 2017, the court entered a dispositional order (1) finding respondents unfit and unable to care for J.W., (2) making J.W. a ward of the court, and (3) placing custody and guardianship of J.W. with the Department of Children and Family Services (DCFS).

¶ 7                                B. Termination Proceedings

¶ 8        In August 2018, the State filed a petition to terminate respondents' parental rights. The petition alleged respondent mother (1) demonstrated an inability to discharge parental responsibilities as supported by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of a mental impairment, mental illness, or developmental disability, and there existed sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable period of time (750 ILCS 50/1(D)(p) (West 2016)); and (2) failed to make reasonable progress toward the return of J.W. within nine

months after an adjudication of neglect, specifically from November 24, 2017, to August 24, 2018 (750 ILCS 50/1(D)(m)(ii) (West 2016)). The petition alleged respondent father failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2016)); (2) make reasonable efforts to correct the conditions that were the basis of removal within nine months of an adjudication of neglect, specifically November 24, 2017, to August 24, 2018 (750 ILCS 50/1(D)(m)(i) (West 2016)); and (3) make reasonable progress toward the return of J.W. within nine months after an adjudication of neglect, specifically November 24, 2017, to August 24, 2018 (750 ILCS 50/1(D)(m)(ii) (West 2016)).

¶ 9                                   1. *Fitness Hearing*

¶ 10        In January 2019, the trial court held a fitness hearing and heard the following evidence.

¶ 11                                a. Jennifer Cunningham

¶ 12        Jennifer Cunningham, the lead foster care nurse with the Center for Youth and Family Solutions (CYFS), testified she followed J.W. on a minimum of a quarterly basis due to her special medical needs. Cunningham worked one-on-one with respondent mother in her home to educate her about J.W.'s medical needs. Cunningham testified, "[J.W.] has a complex disorder called hypopituitarism, with adrenal insufficiency, hypothyroidism and growth hormone deficiency. She also has skeletal deformity, muscle deformity called arthrogryposis multiplex congenita." J.W.'s conditions required specialized equipment, extensive therapies, and adapted surfaces. J.W.'s hypopituitarism and the accompanying hormone problems required daily medications, with specific changes to the medications when she was ill. When J.W. was ill, she required a triple dose of her daily medications.

¶ 13        J.W. also had a specific emergency injection to be given in certain situations. Cunningham testified the emergency injection was required under the following circumstances: "So serious illness or injury. If she is vomiting and unable to keep down her pills for more than so many doses. If she becomes unconscious or lethargic. If she falls and hits her head or breaks a bone. If she's going to receive anesthesia. If she was involved in a serious car accident, those types of things." If J.W. did not receive enough medication in the injection, she could die. In a situation that required an emergency injection, the injection must be given immediately while simultaneously calling 9-1-1. Such an emergency situation did not allow for time to call a doctor or nurse to determine the proper course of action.

¶ 14        According to Cunningham, J.W.'s medication changed based on her growth and at least one medication changed each year. During the doctor's appointment, the doctor would go over J.W.'s medications and provide a written prescription for the medications. If J.W. did not get her steroid medication every day, or if J.W. did not get the proper amount, she would become very ill and potentially die. Cunningham testified J.W. took medications multiple times a day and some medications required less than a full pill. Caregivers received a written protocol to determine when J.W. needed a triple dose of medications or an emergency injection. Cunningham testified J.W. required the triple dose of her medications many times while she had been her nurse.

¶ 15        Cunningham met with respondent mother approximately 15 times. During these meetings, Cunningham went over J.W.'s medical needs, the treatment currently required, and what to do in an emergency. According to Cunningham, she went over possible emergency scenarios and reasons for an emergency injection. Respondent mother was occasionally able to correctly identify the necessary treatment for a given scenario, but not consistently. For

example, one scenario involved J.W. not waking from her nap. Respondent mother gave different answers, including waking J.W. and giving her an extra dose, taking J.W.'s temperature, not waking J.W., and giving J.W. an injection. Respondent mother did not correctly identify the necessary treatment more often after her trainings with Cunningham. Another example involved a scenario where J.W. was vomiting and could not keep her pills down. Respondent mother sometimes identified that as a scenario requiring extra pills and sometimes as requiring an injection.

¶ 16　　　　Cunningham testified respondent mother was very confident in her answers. However, Cunningham did not feel comfortable that respondent mother knew what to do in an emergency, and she did not see any improvement in respondent mother's ability to understand what to do in an emergency. Cunningham acknowledged respondent mother was able to measure the injection and knew to call 9-1-1 if an injection were given. Cunningham testified she had no confidence that respondent mother would respond appropriately in an emergency.

¶ 17　　　　　　　　　　　　b. Andrew Wilson

¶ 18　　　　Andrew Wilson testified he was the caseworker from August 2017 to March 2018. Wilson spoke with respondent father about services, but he declined to participate in services. Wilson wrote a letter confirming respondent father declined services, and respondent mother signed the letter as respondent father's power of attorney. According to Wilson, he explained the import of declining services to respondent father. Respondent father never engaged in any services or visits.

¶ 19　　　　Wilson testified services were offered, including individual counseling, marriage counseling, parenting classes, and substance-abuse treatment. Respondent mother completed a parenting capacity evaluation that resulted in the recommendation for marriage counseling.

However, respondents declined to engage in marriage counseling and respondent father declined individual counseling. According to Wilson, the agency had vans available to transport respondent father (who used a wheelchair).

¶ 20                                    c. Suzzen Borcz

¶ 21        Suzzen Borcz testified she became the caseworker in April 2018. Borcz reviewed respondent mother's psychological evaluation and found it to be consistent with her observations of respondent mother's visits with J.W. According to Borcz, visits were available for respondent father and the agency could provide transportation. Respondent father did not participate in visits or services while Borcz was the caseworker.

¶ 22        When Borcz took over the case, respondent mother's services included random drug tests, counseling, and medical training with Cunningham. Borcz testified respondent mother was compliant with the random drug tests and the only positive result was on September 4, 2018, where she tested positive for marijuana. Respondent mother participated in individual counseling regarding J.W.'s medical needs and the impact on respondent mother's life should J.W. be returned to her care. According to Borcz, respondent mother was capable of basic parenting, including play time, diaper changes, and providing snacks. However, Borcz's main concern was the possibility of a medical emergency during a visit.

¶ 23        Respondent mother had two-hour visits with J.W. every week. Borcz observed respondent mother give J.W. medication one time, and it was a pre-divided quarter of a pill the foster parents provided. Borcz testified she had been trained to give J.W. an emergency cortisone shot "under specific conditions, such as having a fever, or having some sort of medical emergency." Borcz had concerns regarding respondent mother's ability to provide J.W. with proper medication should the pills not be pre-counted and pre-divided.

¶ 24                                    d. Dr. Judy Osgood

¶ 25            Dr. Judy Osgood, a licensed clinical psychologist, testified she completed a

psychological report on respondent mother in May 2018. Respondent mother acknowledged

J.W. was born with cocaine, marijuana, and alcohol in her system. J.W. had "medically complex

problems, require[d] intensive care, including medications, [and] she ha[d] some very serious

kind of life-threatening illnesses." Respondent mother lived with respondent father who was

legally blind, had medical problems, and required significant assistance and care. Respondent

mother also lived with two of her five children, including a 10-year-old daughter who was born

with marijuana in her system and a young adult daughter who provided financial resources to the

family. Although respondent mother disclosed her history of substance abuse, it was

inconsistent with information provided regarding J.W.'s test results at birth and respondent

mother's positive drug screens after DCFS opened the case. At the time she met with Dr.

Osgood, respondent mother was sober but was not participating in any type of recovery program.

¶ 26            According to Dr. Osgood, respondent mother had a superficial understanding of

J.W.'s medical needs. Despite assistance and guidance, respondent mother did not appear to

learn what was needed to care for J.W. Dr. Osgood testified respondent mother had a low-

average working memory and a borderline processing speed, which caused concern regarding

her ability to respond to J.W.'s medical emergencies. J.W.'s medical condition presented

emergency situations requiring immediate response and emergency calculations.

¶ 27            Dr. Osgood administered a wide range achievement test to measure respondent

mother's basic reading and arithmetic skills. According to Dr. Osgood, respondent mother

scored a 69 on the arithmetic test, "which [was] in the extremely low range, and it was at the

fourth[-]grade level." On the untimed test, respondent mother was unable to perform simple

math problems such as adding double digit numbers, dividing 15 by 5, and multiplying double digits. Dr. Osgood testified respondent mother was unable to perform the necessary calculations to deal with an emergency medical situation under the best of conditions, let alone in an emergency. According to Dr. Osgood, in a situation with "a young child with severe and complex medical needs where there are potential life-threatening emergencies on a daily basis due to the circumstances, needing to be able to do calculations, to understand calculations, to respond in an emergency that both with the IQ scores as well as the achievement scores, *** these type of deficits are really very serious and would really create a high risk of harm to this young child." Dr. Osgood acknowledged respondent mother did not meet the criteria for a diagnosis of an intellectual disability. However, she had cognitive deficits that prevented her from learning and retaining information about J.W.'s medical needs. Dr. Osgood testified respondent mother's cognitive deficits were a mental impairment.

¶ 28    Dr. Osgood testified she diagnosed respondent mother with adjustment disorder, polysubstance use disorder, parent-child relational problem, and personality disorder not otherwise specified with narcissistic and histrionic features. According to Dr. Osgood, respondent mother's psychological disorders made her unable to effectively parent J.W. Dr. Osgood recommended all visitation between respondent mother and J.W. be supervised by someone "who is competent, responsible, and capable, who assumes total responsibility for the medical care and treatment of [J.W.], someone who has been trained and educated, who has demonstrated that ability to provide that care."

¶ 29                        e. Carla Dumas

¶ 30    Carla Dumas testified she was respondent mother's therapist. According to Dumas, respondent mother's counseling goals included developing strategies to manage her

difficult emotions without substance abuse, learning to recognize risk factors to J.W., providing for J.W.'s safety, and addressing the stress and contributing factors associated with her involvement with DCFS. Respondent mother participated in sessions until the case goal changed. Dumas and respondent mother discussed the risks to J.W. and respondent mother's ability to respond to her medical needs in a timely fashion. According to Dumas, respondent mother had a working knowledge of J.W.'s illness and needs. Although respondent mother knew J.W. had medical needs, Dumas opined she did not have a realistic idea of the amount of time required for J.W.'s care. Respondent mother was open and honest and knew that DCFS involvement was partly due to her substance abuse.

¶ 31　　　　Dumas testified respondent mother worked on alternatives to marijuana to deal with stress in her life, including walking, exercising, listening to music, and talking to someone. According to Dumas, respondent mother relapsed and informed "they had two positive drops on her in October and November of [2017], and then again in February of [2018]." Dumas testified a relapse would indicate respondent mother was not properly managing stress.

¶ 32　　　　　　　　　　　　f. Respondent Mother

¶ 33　　　　Respondent mother testified she met with Cunningham approximately 15 times. According to respondent mother, these meetings were designed to teach her how to care for J.W.'s medical needs and recognize when J.W. required an injection. Respondent mother testified she previously attended J.W.'s physical therapy sessions and learned how to do J.W.'s exercises. J.W. wore braces on her knees and ankles at night and took daily medications. Respondent mother testified J.W. "takes a thyroid pill in the morning on an empty stomach. She takes hydrocortisone, she takes *** a half a pill in the morning, a quarter pill in the evening, and

a quarter pill at night, and *** she takes vitamin D serum, syrup, at night, and she takes a growth hormone shot at night for six nights, besides one night."

¶ 34 According to respondent mother, J.W. also had "stress doses, where she's having a fever higher than 100, when she bump [*sic*] her head, serious injury." Respondent mother further stated a stress dose was necessary when J.W. was lethargic, broke her arm, did not wake up, or had anesthesia. Respondent mother testified a stress dose was three times the normal dose, or one and a half pills in the morning, three-quarters of a pill in the evening, and three-quarters of a pill at night. Respondent mother then testified J.W. required an emergency injection when she had difficulty waking up, broke her arm, or sprained her ankle. If J.W. ran a fever over 100 degrees, respondent mother would give J.W. a triple dose of her normal medications.

¶ 35 Respondent mother testified she had been married to respondent father for 16 years. Respondent father was blind, had diabetes, required dialysis three times per week, had high blood pressure, and had lost a leg. Respondent mother testified she helped respondent father around the house and administered his medications. Respondent father was not currently taking insulin due to the dialysis, but previously respondent mother administered his insulin. According to respondent mother, respondent father experienced complications with dialysis and she had responded appropriately to his medical emergencies in the past. Respondent mother testified she could handle medical emergencies that might be presented by both her husband and J.W.

¶ 36 g. Trial Court's Ruling

¶ 37 The trial court found the State proved respondent father unfit. In a lengthy written order, the trial court found the State proved by clear and convincing evidence respondent

mother was unfit based on her inability to discharge parental responsibilities supported by competent evidence from a psychiatrist of mental impairment, and there was sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period. The court found respondent mother did not have "the cognitive capacity to protect and maintain the health and safety of this medically complex child, nor to meet her physical needs." Respondent mother's personality disorders—specifically, the narcissistic and over-confidence features—impeded her ability to overcome her cognitive deficits. Dr. Osgood's testimony that respondent mother had limited intellectual capabilities was corroborated by the caseworker, therapist, and nurse. Even after counseling and therapy, respondent mother was unable to accurately identify and respond to J.W.'s medical needs. The trial court also found the State proved, by clear and convincing evidence, that respondent mother failed to make reasonable progress toward having J.W. returned to her care.

¶ 38                              2. *Best-Interest Hearing*

¶ 39          In October 2019, the trial court held a best-interest hearing. The trial court heard the following evidence.

¶ 40                                   a. Megan Ball

¶ 41          Megan Ball testified she was the caseworker from April or May 2019 to September 26, 2019. According to Ball, J.W. lived with her foster parents and their teenaged granddaughter. Ball testified the foster parents were bonded to J.W., loved her, and cared for her appropriately. J.W.'s significant medical issues required a lot of care. When Ball became the caseworker, J.W. was finishing speech therapy and had occupational and physical therapies. J.W. also had a strict medication regimen and emergency protocol that the foster family followed exactly. In addition to J.W.'s medical needs, the foster family also provided for J.W.'s

educational needs. At the time of the best-interest hearing, J.W. was enrolled in a special education prekindergarten class and had an individualized education plan (IEP).

¶ 42 According to Ball, J.W. was placed with her foster family when she left the hospital after her birth. The foster family was the only family J.W. had ever known and the family was well established in the community. The foster family was willing to provide J.W. permanency through adoption. Ball testified it was "absolutely" in J.W.'s best interest to remain with her foster family. Because J.W. was in a specialized care placement, Ball spent significant time observing the foster placement.

¶ 43 b. Chelsey Baker

¶ 44 Chelsey Baker testified she was the caseworker from October 2016 to June 2019. Baker spent significant time in the foster family's home and believed J.W.'s adoption was in her best interest. When asked to explain that belief, Baker testified, "It is apparent that [the foster parents] not only love [J.W.], but they also have the mental capacity to care for her medically and continue to do so. They have been medically trained. They continue to be more informed of anything that occurs as time goes on. And they have formed a bond and attachment with her that I can't put into words." J.W. called the foster parents "mama" and "dada" and sought comfort and guidance from them. Baker acknowledged the foster parents were "a little bit older" but they had an appropriate plan of care should something happen.

¶ 45 Baker testified she observed more than 10 visits with J.W. and respondent mother. According to Baker, respondent mother loved and cared for J.W. However, Baker had concerns about respondent mother's ability to care for J.W.'s specialized needs. Those concerns were part of the reason Baker believed J.W.'s adoption by the foster family was in her best interest. Throughout the case, Baker testified respondent mother completed some of J.W.'s therapy

sessions incorrectly. Respondent mother administered J.W.'s medication during visits after being prompted.

¶ 46                                        c. Suzzen Borcz

¶ 47          Borcz testified she was the current caseworker. According to Borcz, respondent father never attended visits with J.W. or participated in services. Borcz acknowledged respondent mother had a bond with J.W. but there were concerns regarding respondent mother's ability to provide for J.W.'s medical needs. Borcz testified she had significant experience with respondent mother and believed J.W.'s adoption by the foster family was in her best interest.

¶ 48                                        d. Respondent Father

¶ 49          Respondent father testified he was J.W.'s legal father. According to respondent father, the agency never made appropriate transportation available to accommodate his wheelchair. Respondent father testified he wanted to attend visits, but multiple surgeries and transportation issues prevented him from doing so. Respondent father further testified he was scared to attend visits "because they're always—my daughter always come home crying from the so-called foster parents. You know, making my daughter cry because she had cellophane in her house and all that stuff. I know myself too. If they mess with my daughter, I would have said something that's out of hand. That's the reason that I couldn't go because I know where I'm at."

¶ 50          Respondent father testified he believed respondent mother could care for J.W. because she had taken care of him for 20 years. Respondent father acknowledged that he could do more than a baby, but that respondent mother monitored his insulin, administered his medications, and provided for his medical needs. Respondent father's aunt helped provide additional care, but respondent mother did "mostly everything."

¶ 51                             e. Respondent Mother

¶ 52        Respondent mother testified she lived with respondent father and her 12-year-old

daughter.  Respondent mother also had three adult children who stayed in regular contact with

her.  According to respondent mother, her other children were all interested in having a

relationship with J.W.  Respondent mother was willing to provide J.W.'s therapies and

medications.  Respondent mother testified she recently obtained a vehicle and had help from her

adult children, her brother, and her sister-in-law.  According to respondent mother, she was never

given the opportunity to have J.W. in her home with her family or to prove respondent mother's

ability to administer J.W.'s medications.

¶ 53                             f. Trial Court's Ruling

¶ 54        The trial court found it was in J.W.'s best interest to terminate respondents'

parental rights.  The court considered the statutory factors.  Specifically, the court noted J.W.'s

significant, life-long medical conditions that posed life-threatening emergency circumstances

that required immediate recognition and response.  The court acknowledged J.W. developed her

sense of identity within the foster family, where J.W. had spent the entirety of her life outside of

the hospital.  Although J.W. had a bond with respondent mother, her sense of attachment,

security, and familiarity were with the foster family.  The minor's need for permanence, stability,

and safety weighed in favor of J.W. remaining in the foster placement as it was the least

disruptive placement.  Accordingly, the court entered an order terminating respondents' parental

rights.

¶ 55        This appeal followed.  We docketed respondent mother's appeal as case No. 4-19-

0732 and respondent father's appeal as case No. 4-19-0733.  We have consolidated the cases for

review.

¶ 56                                    II. ANALYSIS

¶ 57          On appeal, respondents assert (1) the trial court erred by finding respondents unfit and (2) the court's best-interest findings were against the manifest weight of the evidence. We turn first to the fitness finding.

¶ 58                                 A. Fitness Finding

¶ 59          In a proceeding to terminate parental rights, the State has the burden of proving parental unfitness by clear and convincing evidence. *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067, 808 N.E.2d 596, 604 (2004). In making such a determination, the court considers whether the parent's conduct falls within one or more of the unfitness grounds described in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2016)). Evidence of unfitness based on any ground enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2016)) is enough to support a finding of unfitness, even where the evidence may not be sufficient to support another ground. *In re C.W.*, 199 Ill. 2d 198, 210, 766 N.E.2d 1105, 1113 (2002). A reviewing court will not overturn the trial court's finding of unfitness unless it is against the manifest weight of the evidence. *Jordan V.*, 347 Ill. App. 3d at 1067. The trial court's decision is given great deference due to "its superior opportunity to observe the witnesses and evaluate their credibility." *Id.*

¶ 60          In this case, the State alleged respondent mother was unfit on two grounds: (1) she demonstrated an inability to discharge parental responsibilities as supported by competent evidence from a psychiatrist of a mental impairment, mental illness, or developmental disability, and there existed a sufficient justification to believe the inability to discharge parental responsibilities extended beyond a reasonable time; and (2) she failed to make reasonable progress toward J.W.'s return within nine months of an adjudication of neglect, specifically from

- 15 -

November 24, 2017, to August 24, 2018. The State alleged respondent father failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to J.W.'s welfare; (2) make reasonable efforts to correct the conditions that were the basis of removal within nine months of an adjudication of neglect, specifically November 24, 2017, to August 24, 2018; and (3) make reasonable progress toward the return of J.W. within nine months after an adjudication of neglect, specifically November 24, 2017, to August 24, 2018. The trial court found respondents unfit based on the allegations in the State's petition.

¶ 61　　　　On appeal, respondents contend the trial court's finding of unfitness was against the manifest weight of the evidence. We may affirm on any basis in the record and we need not review all the grounds for a finding of unfitness if we uphold the trial court's findings as to one ground of unfitness. See *In re D.H.*, 323 Ill. App. 3d 1, 9, 751 N.E.2d 54, 61 (2001). As we find the trial court's finding as to reasonable progress dispositive, we begin there.

¶ 62　　　　The trial court's finding that respondents failed to make reasonable progress toward the return of the minor within nine months after an adjudication of neglect, specifically November 24, 2017, to August 24, 2018, was not against the manifest weight of the evidence. Reasonable progress is measured by an objective standard that considers the progress made toward the goal of returning the child to the parent. *In re M.A.*, 325 Ill. App. 3d 387, 391, 757 N.E.2d 613, 617 (2001). Specifically, reasonable progress includes a parent's compliance with service plans and court directives, in light of the condition that gave rise to the removal of the child. *In re C.N.*, 196 Ill. 2d 181, 216, 752 N.E.2d 1030, 1050 (2001).

¶ 63　　　　In this case, the child came into DCFS care because she was born with controlled substances in her system. However, J.W. also had life-threatening medical conditions that required extensive care. During the nine-month period at issue here, respondent father declined

to engage in any services or attend any visits with J.W. Although respondent father points to his own health issues to excuse his failure to engage in any services or attend any visits, testimony from the caseworkers show DCFS was willing to provide services and transportation. Although respondent father disputed that testimony at the best-interest hearing, the trial court was in the best position to weigh the credibility of the witnesses and assess the testimony. Despite DCFS's willingness to help and provide services, respondent father declined *all* the offered services and made no progress whatsoever toward the return of J.W. The court's conclusion that respondent father failed to make reasonable progress was not against the manifest weight of the evidence. The evidence clearly showed respondent father failed to make any progress whatsoever during the relevant nine-month period.

¶ 64 Respondent mother contends the trial court's finding of unfitness was against the manifest weight of the evidence where Dr. Osgood "did not specifically delineate what parental responsibilities [respondent mother] could not provide for the child." Respondent mother further argues there was no evidence she could not provide for J.W.'s medical needs.

¶ 65 We first note respondent mother does not address the trial court's conclusion that she failed to make reasonable progress toward J.W.'s return. We note again that J.W. was taken into care after controlled substances were found in her system at birth. Respondent mother contends she completed all required services in this case. Although respondent mother appears to have completed her services, we note her counselor testified to multiple positive drug tests in late 2017 and February 2018. Additionally, the court found respondent mother failed to make reasonable progress toward being able to understand and identify when J.W. had a health emergency. This finding was supported by the testimony.

¶ 66        Cunningham testified respondent mother continues to give inconsistent and incorrect responses to emergency scenarios even after 15 training sessions.  Indeed, respondent mother's own testimony at the fitness hearing contained inconsistent responses to identical emergency scenarios.  The testimony supported a finding that respondent mother failed to make reasonable progress toward J.W.'s return where she failed to consistently identify and respond to possible health emergencies.  Although respondent mother provided respondent father with health care, this alone is insufficient to show her fitness because of J.W.'s unique health conditions.  J.W. required extensive medication that changed in dose depending on specific circumstances.  While the evidence showed respondent mother was successfully able to give J.W. a pre-divided dose of medication, her own testimony showed she gave different answers as to whether a particular scenario required a triple dose or an emergency injection.

¶ 67        Given respondent's failure to make progress in learning the specifics of J.W.'s health conditions—including the ability to identify emergency situations and appropriate responses—we cannot say the trial court's determination respondent failed to make reasonable progress toward having J.W. returned to her care was against the manifest weight of the evidence.

¶ 68                              B. Best-Interest Finding

¶ 69        Once the trial court determines a parent to be unfit, the next stage is to determine whether it is in the best interest of the minor to terminate parental rights.  *In re Jaron Z.*, 348 Ill. App. 3d 239, 261, 810 N.E.2d 108, 126 (2004).  The State must prove by a preponderance of the evidence that termination is in the best interest of the minor.  *Id.*  The trial court's finding will not be overturned unless it is against the manifest weight of the evidence.  *Id.* at 261-62.

¶ 70        The focus of the best-interest hearing is to determine the best interest of the child,

not the parent.  705 ILCS 405/1-3(4.05) (West 2016).  The trial court must consider the

following factors, in the context of the child's age and developmental needs, in determining

whether to terminate parental rights:

> "(a) the physical safety and welfare of the child, including
>
> food, shelter, health, and clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial,
>
> cultural, and religious;
>
> (d) the child's sense of attachments ***[;]
>
> * * *
>
> (e) the child's wishes and long-term goals;
>
> (f) the child's community ties, including church, school,
>
> and friends;
>
> (g) the child's need for permanence which includes the
>
> child's need for stability and continuity of relationships with parent
>
> figures and with siblings and other relatives;
>
> (h) the uniqueness of every family and child;
>
> (i) the risks attendant to entering and being in substitute
>
> care; and
>
> (j) the preferences of the person available to care for the
>
> child." *Id.*

¶ 71    The trial court, in considering the relevant best interest factors, concluded that the evidence showed J.W. was bonded to her foster family. J.W. was doing well in her foster placement, as evidenced by her sense of attachment, security, and safety. J.W. was enrolled in a special needs prekindergarten program and had an IEP. The foster parents were capable of providing for her extensive health needs and Baker testified they were the most informed about J.W.'s care. Moreover, the foster parents expressed willingness to provide permanency for J.W. through adoption. The evidence established J.W. was in a stable, loving home with foster parents who were willing to provide her with permanency.

¶ 72    Conversely, respondents failed to demonstrate their ability to provide stability and permanence for J.W. in the near future. Respondent father failed to demonstrate it was not in J.W.'s best interest to terminate his parental rights where he never attended visitation or formed a bond with J.W. Although respondent mother and J.W. had a bond, the caseworkers testified they had concerns about respondent mother's ability to provide for J.W.'s life-long medical needs. Respondent mother failed to make reasonable progress toward J.W.'s return in the time the case was pending. Respondent mother was unable to identify and accurately respond to possible emergency scenarios. The trial court noted the failure to properly respond to J.W.'s medical emergencies could be fatal. The court determined the children's need for permanence, stability, and security outweighed any harm from terminating respondents' parental rights. Accordingly, the court determined it was in J.W.'s best interest to terminate respondents' parental rights.

¶ 73    Given the extent to which the child was thriving in her foster placement and the possibility of permanence and stability in the near future through adoption, we conclude the trial court's finding it was in J.W.'s best interest to terminate respondents' parental rights was not against the manifest weight of the evidence. Accordingly, we affirm the judgment of the court.

¶ 74                                    III. CONCLUSION

¶ 75             For the foregoing reasons, we affirm the trial court's judgment.

¶ 76             Affirmed.